INTERCONTINENTAL RUBBER COMPANY, Respondent, *v.* CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY, Appellant.

First Department, December 5, 1919.

Carriers — action to recover value of animals which died after transportation by defendant — evidence raising questions for jury as to negligence — erroneous direction of verdict — alleged departure by carrier from designated route of shipment — evidence — admission by agent not binding upon principal.

In an action to recover the value of horses delivered to the defendant for transportation to the plaintiff's assignor, it appeared that six of the animals were dead at the time of delivery while seventy more died within two days after their arrival. The plaintiff set forth two causes of action,

**650** INTERCONTINENTAL RUBBER CO. *v.* C., B. & Q. R. R. CO.

First Department, December, 1919. [Vol. 189.

*first*, one based upon the negligence of the defendant in unreasonably detaining the horses during transportation so that they became sick as the proximate result of the defendant's negligence; and *second*, an action based upon the alleged fact that the defendant, departing from instructions, shipped the horses over its own railroad instead of over the railroad directed by the consignor.

On all the evidence, *held*, that it was error to direct a verdict for the plaintiff upon the first cause of action for, taking the evidence most favorable to the plaintiff, there were questions for the jury, *first*, as to the condition of the horses when delivered to the defendant; *second*, as to the time of their arrival; *third*, as to the nature of the disease from which they died, and *fourth*, as to whether the disease was due to the defendant's negligence.

*Held, further*, that it was error to direct a verdict for the plaintiff on the second cause of action as there was no proof which would even justify a finding by the jury that there was any agreement to ship by a particular route.

A letter from the defendant's agent, written ten days after the shipment of the animals and stating that the cars containing the animals were routed " in line with your instructions," is not corroborative of an agreement to ship by a certain route.

APPEAL by the defendant, Chicago, Burlington and Quincy Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 27th day of May, 1919, upon the verdict of a jury, and also from an order entered in said clerk's office on the same day denying defendant's motion for a new trial made upon the minutes.

*John Godfrey Saxe* of counsel [*Edwin D. Worcester* with him on the brief; *Worcester, Williams & Saxe*, attorneys], for the appellant.

*Richard M. Page* [*William H. Page* with him on the brief], for the respondent.

DOWLING, J.:

This action is brought to recover the value of seventy-eight horses out of a total of four hundred and twenty received by the defendant at Denver, Colo., for transportation to the Erie yards, Weehawken, N. J., consigned to the plaintiff's assignor. Out of the shipment two horses disappeared in transit in some unexplained way; six were dead at the time of delivery, and seventy more died in the yards within two days after their arrival.

The first cause of action is based upon the allegations that

defendant failed and neglected to safely, carefully and securely transport and deliver said horses within a reasonable time, but, on the contrary, so negligently and carelessly conducted itself in that behalf, and unreasonably and negligently delayed and detained said horses in the transportation thereof, that seventy-eight of them were made sick and died before reaching their destination or soon thereafter as the immediate and proximate result of the negligent acts of defendant, and that the remainder thereof were delivered by defendant to plaintiff's assignor at Weehawken in a sick and damaged condition.

The second cause of action is based on allegations that at the time of receiving the horses in question at Denver, defendant was instructed and directed by the consignor thereof to carry, transport and convey said horses over its own railroad and that of the Indian Harbor Belt Railroad Company to West Hammond in the State of Indiana, and thence to forward and send on the same via the Erie railroad to the Erie yards at Weehawken, N. J., there to be safely, carefully and securely delivered in good order to and for the plaintiff's assignor with reasonable despatch; but that defendant, in violation of its undertaking and duty, did not, nor would, forward the said horses via the said Erie railroad from West Hammond to the Erie yards at Weehawken, N. J., pursuant to said instructions and directions so given to it, but, on the contrary, sent on the horses from West Hammond via the Michigan Central railroad without the authority, consent or approval of the consignor thereof, and by means whereof, while said horses were being transported to Weehawken, seventy-eight thereof were made sick and died before reaching their destination, or soon thereafter, as the immediate and proximate result of the wrongful act of the defendant, and the remainder thereof were delivered by defendant to plaintiff's assignor at Weehawken in a sick and damaged condition.

The horses in question were shipped from Denver, Colo., in twenty cars, leaving there January 11, 1916. As to the date of their arrival at Weehawken, there is a question of fact, plaintiff claiming that nineteen of the cars did not arrive there until ten P. M. and midnight of January eighteenth, or as early as one A. M. on January nineteenth, while the defendant claims that they arrived on the night of January

**652** Intercontinental Rubber Co. *v.* C., B. & Q. R. R. Co.

First Department, December, 1919.　　　　[Vol. 189.

seventeenth between seven-twenty and eleven P. M. Concededly, the twentieth car was delayed, arriving there on either the nineteenth or twentieth, but that delay is not material, as it has not been shown that any of the horses that died came from that car, and certainly no horse was dead in that car on its arrival.

The plaintiff claims that the defendant is liable as an insurer for the safe carriage and delivery of the horses in question, under the general rule that a common carrier is absolutely liable for the safe carriage and delivery of property intrusted to its care, except for loss or injury occasioned by the acts of God or public enemies, the only modification being that the common carrier is not liable for any injuries arising as a consequence of the conduct or propensities of animals undertaken to be carried, resulting from their inherent nature and characteristics. It is its contention that the burden was upon the defendant of pleading or proving a defense which would bring it within the exception to the general rule. The plaintiff proved the delivery of the horses in question at Denver, Colo., and introduced evidence that when loaded in the cars they were in good health. Gordon Hollis, president of the company which sold these horses to plaintiff's assignor, testified to the fact that their health and condition were good, and that he had paid special attention to them because plaintiff's assignor was his personal friend, and he examined the mouth of every horse that was bought by his friend. He also testified that the United States Bureau of Animal Industry was furnished with a copy of the loading orders, and that horses could not be loaded in cars if they had any disease. It appears from the way bill that such a certificate of government inspection must be attached thereto. Hollis also testified that these horses had been passed by the veterinarian representing the French government, to whom the horses had been sold; and the certificate of that veterinarian, Dr. Lafon, shows he had examined the 420 horses in question and found them free from disease and in good health, and branded them on January seventh, eighth, tenth and eleventh. Concededly, the horses in question either died *en route* or within two days after their arrival at Weehawken, and upon arrival there were sick and in bad physical condition.

What the precise disease was from which they suffered and died is a matter of controversy. There was some testimony that six of the horses which died on the way suffered from exposure and overriding, showing signs of traveling fever, and that the remainder died because of the severe weather during which they were traveling, the exposure and the length of the journey, or, as the witness Bond put it, the cause of their death was overriding. This witness also testified that if water was given to horses immediately after they came out of the train, there was danger that they would take cold, and that there should be a delay of six hours in watering them. But so far as Bond knew, the deaths of the horses in question were in no way due to failure to take proper care of them, so far as giving them water was concerned. The witness Gill testified to the poor appearance of these horses when they arrived; heads drooping, flanks shrunken, breathing heavily, and many of them running at the nose; but he did not undertake to give the nature of their ailment. The witness Treadwell testified to their condition, but not to the nature of the disease from which they were suffering. The plaintiff on rebuttal called Dr. Harry C. Crawford, veterinarian, and in answer to a hypothetical question he gave the nature of the disease which caused the death of these horses as contagious pneumonia. He described the symptoms of this disease, some of which had been testified to by previous witnesses as present in these animals on and shortly after their arrival, but he also said that this disease reached its crisis in from about eight to ten days. He also testified that delay on a journey which should take six days by rail in extremely cold weather would have an effect on horses subject to this disease and would jeopardize their chances of making a recovery. He said the withholding of water until six hours after their arrival would have had no effect upon the ailment, and that it would normally take upwards of eight days for the crisis of the disease to arrive. He also testified that the ordinary source of infection would be infected stock cars, and that it was possible for the presence of other horses suffering from the trouble to spread the disease to other horses in the same car.

The learned trial court directed a verdict for the full amount

claimed by plaintiff, upon the ground that the defendant was an absolute insurer and that the evidence was undisputed that the horses were accepted free from disease when shipped from Denver, and that they arrived at the Weehawken yards in a dying condition. We think this was error. In the first place, the plaintiff absolutely failed to establish the allegations of its complaint that the defendant had been guilty of negligence in the transportation of these horses. There was no evidence that the defendant had been guilty of a single act during the period of transportation which brought about the condition of the horses on their arrival. The sole ground of negligence assigned in this cause of action is, in effect, that the defendant failed to deliver these horses in a reasonable time, but negligently delayed and detained them in transportation. If this were the cause of the death of the horses, then plaintiff upon showing that fact could have recovered upon proof that a negligent delay in transportation had occurred. But it has failed in both elements of proof. While there would be a question for the jury as to the nature of the disease or trouble which caused the death of these horses, in view of the conflicting testimony offered by plaintiff from Bond and Crawford, yet the more credible testimony would seem to be that of the expert who attributes the death to contagious pneumonia, and that condition might arise either because of infected cars or the presence of some horses infected with this disease. There is no proof that the cars were infected. The certificate of inspection by Dr. Lafon carries the examination of some of them (when they were found in good condition) as far back as January seventh, four days before they were delivered to the defendant. They may well have contracted the disease during the following four days. Other parts of the shipment were examined in like manner three days and one day before the trip east began. There is no testimony as to the condition under which these horses were kept by the consignor in Denver which could preclude the danger of their having contracted the disease before they started on the trip. Furthermore, there was a sharp conflict of testimony as to the time of arrival of the nineteen cars at Weehawken, and this became most material in view of Crawford's testimony as to the period of time which elapses between the contracting

of the disease and its crisis. If the defendant's testimony as to the time of arrival of the cars was accepted by the jury, and if they also believed the testimony of Dr. Crawford, then it must follow that some of these horses, if not all of them, were infected with contagious pneumonia when the shipment left Denver, and, therefore, the deaths were due to the condition of the horses themselves and could in no way be charged to the defendant; for those originally infected might well have infected the others in transit. But under no view of the testimony could a verdict in favor of the plaintiff upon this first cause of action have been directed, because from the most favorable view of the evidence for plaintiff there were questions for the jury: *First,* as to the condition of the horses when they were delivered to defendant at Denver; *second,* as to the time of their arrival in Weehawken; *third,* as to the nature of the disease from which they died; and, *fourth,* as to whether that disease was due to defendant's negligence.

Nor was the learned trial court justified in directing a verdict for the plaintiff upon the second cause of action. That was based upon the allegation that specific shipping instructions had been given under which the twenty cars were to be transported from West Hammond, Ind., to the Erie yards at Weehawken, N. J., via the Erie railroad. It appears that these horses were delivered to the defendant at the stock yards at Denver at about three P. M., on January 11, 1916. There was a live-stock contract furnished by the defendant through its agent, which is used instead of a bill of lading as in the case of ordinary freight. Hollis, who had sold these horses to the plaintiff's assignor, had a copy of the live-stock contract on the strength of which he was to get his bank at Denver to cash the draft attached, and he asked the bank officials to keep the bank open until late that night, as he wanted to get credit for the money. The assistant cashier of the Denver bank would not give credit to Hollis for the draft because the live-stock contract specified the consignee as " Gerald Browne, New York City, N. Y.," with no specific destination. Whereupon Hollis, through defendant's general agent, secured the consent of Kellogg, the defendant's agent at Denver at the Union Stock Yards, to the insertion of the words " Erie Yards, Weehawken, N. J.,"

and upon this insertion being made the bank gave Hollis credit for his draft.     One of the original live-stock contracts, there being three in all made out simultaneously, was given to the two caretakers who accompanied the shipment and served as their transportation.   The defendant offered a copy of the original live-stock contract in evidence, and that contained the consignment to " Gerald Browne, New York City, N. Y., Weehawken Yards."   But there is no dispute that the place of destination agreed upon was the Erie yards at Weehawken, N. J.   The controversy arises because plaintiff claims that specific instructions were given to send these cars over the lines of the Erie railroad from West Hammond, Ind., to Weehawken, while the defendant claims that no such specific instructions were ever given it, and that, therefore, it sent the cars via the Michigan Central railroad, as it had a perfect right to do, ultimately delivering them at the place of destination agreed upon.

Upon this record, the plaintiff has absolutely failed to prove that specific instructions were ever given to the defendant to ship these cars of horses via the Erie railroad, or that the defendant ever agreed so to do.   The plaintiff has offered certain way bills which show a routing from West Hammond via the Erie railroad to Weehawken, but these do not constitute the contract between the shipper and the railroad, and could at best only be corroborative of the existence of an agreement so to ship, if such agreement had been testified to by some competent witness.   In like manner, plaintiff has offered in evidence a letter from Kellogg, the agent of the defendant at the stock yards in Denver, dated January 21, 1916, in which he informed Hollis that the twenty cars of horses were routed from West Hammond via the Erie railroad " in line with your instructions."   But this likewise would only be corroborative of the existence of such an agreement if otherwise proven, and could not constitute an agreement in itself.   The letter was written by Kellogg ten days after the horses had left Denver, and some time after their arrival at Weehawken, under any aspect of the testimony.   Some evidence was given upon the trial by Browne as to instructions given by him to the Hollis & Platt Company as to routing, and then his conclusions were given as to these instructions

having reached the defendant; but on motion all this was stricken out by the court at the close of the plaintiff's case. I am unable to find any evidence remaining in the record upon which the court was justified in finding that the route of this shipment ever was agreed upon between the shipper and the railroad, nor is there any evidence which would justify a jury in finding that such an agreement ever was made. The direction of a verdict based upon the second cause of action was, therefore, erroneous.

The judgment and order appealed from will be reversed and a new trial ordered, with costs to appellant to abide the event.

CLARKE, P. J., SMITH, PAGE and PHILBIN, JJ., concurred.

Judgment and order reversed and new trial ordered, with costs to appellant to abide event.